**COURT OF APPEALS
DECISION
DATED AND FILED**

**February 15, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      **2021AP1292**

**STATE OF WISCONSIN**

Cir. Ct. No.  **2020ME19**

**IN COURT OF APPEALS
DISTRICT III**

IN THE MATTER OF THE MENTAL COMMITMENT OF L. E.:

TAYLOR COUNTY HUMAN SERVICES,

    PETITIONER-RESPONDENT,

  V.

L. E.,

    RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Taylor County: ANN KNOX-BAUER, Judge. *Affirmed*.

¶1      STARK, P.J.[1]  Luca[2] appeals from orders extending his involuntary commitment and for involuntary medication and treatment, both entered pursuant

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2019-20). All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

to WIS. STAT. ch. 51. Although Luca does not challenge his underlying recommitment, he argues that the circuit court improperly shifted the burden to him to prove that he did not require locked inpatient care, and that Taylor County Human Services ("the County") failed to present sufficient evidence to support the court's conclusion that placement in a locked inpatient facility was the least restrictive placement he required. In addition, Luca challenges the court's determination that he was not competent to refuse medication or treatment.

¶2 We conclude the County presented ample evidence to support the circuit court's order that Luca's placement in a locked inpatient facility was the least restrictive placement required, and that the court did not shift the burden of proof from the County to Luca on that issue. Additionally, sufficient evidence supported the court's order for involuntary medication and treatment. Accordingly, we affirm both orders on appeal.

## BACKGROUND

¶3 In September 2020, Luca entered an emergency room and cut his forearms with a razor blade in full view of a hospital employee, stating he had quit his job and was planning to kill himself. Luca was subsequently involuntarily committed pursuant to WIS. STAT. ch. 51 on September 28, 2020, for a period of six months. The circuit court did not enter an order for involuntary medication and treatment during the period of Luca's initial six-month commitment.

---

[2] For ease of reading, we refer to the appellant in this confidential matter using a pseudonym, rather than his initials.

2

¶4     The following February, the County filed a petition to extend Luca's commitment by one year. The circuit court held a recommitment hearing on March 18, 2021. Doctor Brian Stress, a psychologist, testified about his examination of Luca conducted in preparation for the hearing, his review of Luca's records, and his discussions with Luca's counselor and social worker.

¶5     Doctor Stress stated that although Luca was "pleasant" and "respectful," he "continues to have suicidal thoughts all day every day when he's basically awake." Stress recounted that Luca had explained to him in detail his plans and thoughts of killing himself while in inpatient treatment—including jumping from a water tower, drowning himself, standing his bed up on end and letting it fall on his head, and suffocating himself with a plastic bag. Luca had further described to Stress that while at an inpatient facility during his initial commitment, he had smashed his clock radio, taken one of the broken plastic pieces, and cut his leg. Stress opined that this incident could have been either a suicide attempt or lesser "self-injurious behavior." Stress testified that Luca had previously attempted to commit suicide on several occasions and had started having suicidal thoughts as early as twelve years old.

¶6     Doctor Stress testified he believed Luca suffered from "borderline personality disorder, adjustment disorder with depression and anxiety chronic versus major depressive disorder currently in remission [without[3]] psychotic traits, alcohol use disorder episodic in forced remission, and Cannabis use disorder constant in forced remission." He opined that Luca's thought processes "were

---

[3] Although Doctor Stress initially testified that he believed Luca suffered from a major depressive disorder *with* psychotic traits, on cross-examination he clarified that he had misspoken, and that Luca suffered from a disorder *without* psychotic traits.

impaired due to his mental health symptoms, suicidal ideations, and [his] planning to kill himself." Stress testified that he believed Luca to be a proper subject for treatment and dangerous. He opined: "[I]f treatment were removed[,] there's a more likely than not probability that [Luca] would unfortunately participate in behaviors that could result in his injury or death based on his thoughts and past behaviors."

¶7 Doctor Stress further testified that he had explained Luca's medication to him, and that although Luca understood what Stress was saying, "he indicated that he didn't want to participate in treatment. He just wanted to be dead." Stress noted that although Luca explained he might be willing to take the "right medication," when asked what that medication might be, Luca indicated that he did not know, and that "pot" was the only thing that actually helped him.

¶8 Doctor Stress noted that Luca was prescribed Gabapentin to be taken twice a day, but that Luca stated he was taking the medication "as needed only." Stress testified that Luca's

> insight is impaired related to his mental health and alcohol and drug symptoms which could result in impaired judgment and subsequent poor behaviors. So the— depending on his mental health symptoms which very clearly he does not appear to have an understanding of the advantages and disadvantages and I don't believe he's competent to accept or refuse medications as a result of that, in my opinion.

Stress concluded that the least restrictive environment for Luca consistent with his treatment needs "would be continued placement in a locked facility to attempt to [e]nsure his safety and the safety of those he interacts with here." Stress explained that once Luca made improvements, an outpatient facility could become appropriate.

¶9 Brooke Bauer, a certified social worker from Luca's inpatient care facility, testified next. Bauer described Luca's level of engagement in the available treatment and therapies at the facility as "[l]ittle to none." Bauer explained that the facility offered activities such as therapy, physical exercise, and mindfulness exercises, and that while Luca went to activities when he was asked to attend, "there's some questionability about if he feels it's beneficial to him similar to what Doctor Stress said." Bauer stated that one of the treatment goals Luca had developed was mood stabilization and "just finding joy in something, frankly," but that Luca had not been progressing in meeting his goals as a result of his mood fluctuations.

¶10 Bauer confirmed that Luca regularly discussed death with her, and that he had made comments about killing himself in "similar if not almost identical conversations as Doctor Stress has." Bauer explained that Luca was not actively on suicide watch as he had been doing well in requesting a seclusion room, or similar options if he was feeling as though he was a danger to himself. Luca's county case manager, Michelle Deml, briefly testified, noting that Luca made comments about wanting to kill himself "[e]very time" she had spoken with him, and "that's the primary goal he identifies."

¶11 The circuit court found that Luca had a mental illness that resulted in suicidal ideation, making plans about ways to commit suicide, and self-harm. The court concluded that Luca met the standards for commitment given the significance of his mental health issues and the lack of progress that he had made in overcoming his suicidal thoughts and actions. The court ordered that Luca be placed in locked inpatient treatment. In support of this placement decision, the court relied on the testimony of Dr. Stress, who opined that Luca needed to be placed in a locked inpatient facility, which would be the least restrictive placement

consistent with the level of protection that he needed. The court recognized the possibility that Luca might be frustrated due to being placed in a locked facility, but it concluded that "the primary thing here is keeping him safe."

¶12 The circuit court separately issued a written decision and an order for Luca's involuntary medication and treatment, finding that the County had presented clear and convincing evidence that Luca was not competent to refuse medication. The court reasoned that Luca had expressed to Dr. Stress that he did not want to participate in voluntary treatment, and that "he just wants to die." In addition, the court noted that Luca was unable to explain the effect Gabapentin had on him except to say that the only medication he wanted to take was "pot." The court concluded: "[I]t is clear that [Luca's] belief that he should die prevents him from a legitimate thought-process regarding the risk and benefits of taking Gabapentin."

## DISCUSSION

### I. Least Restrictive Placement

¶13 Luca first argues that the circuit court improperly shifted the burden from the County to him to prove that he did not require locked inpatient care. When a court commits a person under WIS. STAT. ch. 51, it must also "designat[e] the maximum level of inpatient facility, if any, that may be used for treatment." WIS. STAT. § 51.20(13)(c)2. This statute protects a committee's due process interest "that a commitment determination consider those alternatives which would have a less drastic effect on the curtailment of the individual's freedom and civil liberties." *J.R.R. v. State*, 145 Wis. 2d 431, 437, 427 N.W.2d 137 (Ct. App. 1988). Review of a circuit court's recommitment order under § 51.20 presents a mixed question of fact and law. *Waukesha Cnty. v. J.W.J.*, 2017 WI 57, ¶15, 375

Wis. 2d 542, 895 N.W.2d 783. Appellate courts uphold the circuit court's findings of fact unless they are clearly erroneous, but whether the facts satisfy the statutory standard is a question of law that is reviewed de novo. *Id.*

¶14 In analyzing Luca's least restrictive placement, the circuit court stated: "It hasn't been demonstrated sufficiently that [Luca] wouldn't engage in self-harm if he were allowed to be in a group home or that there are sufficient safeguards with that type of placement that would satisfy the court that he should be in that lesser restrictive environment." Luca argues that this language evidences the court's impermissible shift of the burden of proof to him, requiring him to show that he would not engage in self-harm in a less restrictive setting.

¶15 Luca correctly argues that the burden is on the County in a recommitment proceeding to prove all required facts by clear and convincing evidence. *See* WIS. STAT. § 51.20(13)(e); *Langlade Cnty. v. D.J.W.*, 2020 WI 41, ¶23, 391 Wis. 2d 231, 942 N.W.2d 277. We conclude that the circuit court's statement is somewhat ambiguous due to its use of passive voice and a double negative. In the context of the court's overall analysis, however, it is evident that it did not shift the burden of proof to Luca on the issue of his least restrictive placement.

¶16 After finding that Luca was mentally ill and suffered from suicidal ideation, the circuit court discussed the evidence in the record that supported its placement determination, relying on Dr. Stress's opinion that Luca required inpatient treatment for his own safety. The language Luca highlights was no more than the court's conclusion—as a part of its broader analysis—that due to the lack of safeguards in less restrictive placements, no facts in the record supported a placement with less supervision than provided in an inpatient facility. The court

did not state that it was altering the burden of proof, or that it was placing that burden on Luca. It also did not ask Luca to present evidence, or suggest that Luca was required to prove certain facts or circumstances on the issue of placement. The burden to support the recommitment remained on the County, and we conclude that the burden of proof was not impermissibly shifted to Luca.

¶17    Luca also argues that the County failed to prove that placement in a locked inpatient facility was the least restrictive placement he required.[4] The testimony presented at the recommitment hearing, however, supported the circuit court's decision to order locked, inpatient treatment. Bauer, Deml and Dr. Stress all testified that Luca constantly talked about dying and the ways in which he thought about or planned to commit suicide. Stress confirmed that Luca was dangerous due to his impaired judgment and that he "didn't want to participate in treatment. He just wanted to be dead." In addition, Luca had a long history of suicidal ideation and he had even cut himself with a broken clock radio while under commitment at the inpatient facility. Given these circumstances, it was reasonable for the court to conclude that Luca required placement in an inpatient environment with significant supervision to ensure that he would not act on his suicidal thoughts and plans.

¶18    Luca appears to argue that the circuit court abdicated its role to Dr. Stress in determining his least restrictive placement. We disagree. The court could reasonably rely upon the testimony and report of the sole expert in making

---

[4] We note that Luca does not challenge the underlying recommitment order and he instead raises arguments solely related to the restrictiveness of his placement. As a result, we do not conduct an analysis related to dangerousness or the remainder of the circuit court's conclusions made at the recommitment hearing.

its decision about Luca's placement. The court is not required to accept the testimony of an expert. *See **State v. Brown***, 2005 WI 29, ¶¶88-89, 279 Wis. 2d 102, 693 N.W.2d 715. However, it cannot be criticized for relying upon the expert's opinion if, as here, it is supported by the record. *See **Wisconsin v. Kienitz***, 227 Wis. 2d 423, 440, 597 N.W.2d 712 (1999) ("The trier of fact has the ability to accept so much of the testimony of a medical expert that it finds credible, and it then weighs the evidence and resolves any conflicts in testimony." (citations omitted)).

¶19 Luca argues that inpatient treatment was not required as he was not on suicide watch at the time of the hearing. He points to Bauer's testimony that he participated in activities at the facility and that he had "made agreements" with the staff about what to do when he felt depressed, including developing coping techniques such as isolating himself. These facts, while relevant, do not mean that it was not appropriate for Luca to be subject to inpatient treatment given his significant risk of suicide and other self-harm. The coping mechanisms Luca argues he uses were based upon the relationship he developed with the inpatient facility staff, the availability of an isolation room, and his willingness to ask for help to access it—all resources that would be less accessible or inaccessible in less restrictive placement settings.

¶20 Furthermore, Bauer testified to the unique nature of the inpatient placement, stating that "[Luca] feels a sense of support there that he does not feel in other places." Although Luca argues that no special protocols such as suicide checks were in place, Bauer testified that those protocols would be available if Luca was feeling actively suicidal. Given the evidence of Luca's significant and ongoing suicide risk and his treatment needs, the circuit court's finding that his

placement in an inpatient facility with the capacity for enhanced suicide protection was the least restrictive placement he required is amply supported by the evidence.

## II. Order for Involuntary Medication and Treatment

¶21    Luca next argues that the circuit court erred in entering an order for his involuntary medication and treatment.  He contends that he was capable of understanding his medication and condition, and he was therefore competent to refuse medication.

¶22    In order to establish that a person is not competent to refuse medication or treatment under WIS. STAT. § 51.61(1)(g)4., the County has the burden of proving one of two standards: (1) that the individual is incapable of expressing an understanding of the advantages and disadvantages of accepting medication or treatment and the alternatives; or (2) that the individual is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his or her mental illness, developmental disability, alcoholism or drug dependence in order to make an informed choice as to whether to accept or refuse medication or treatment.[5]

¶23    The circuit court checked the box on the form order for recommitment indicating that Luca met the second of these standards, although it

---

[5] Although the wording is not explicit in the plain language of the statute, the second standard under WIS. STAT. § 51.61(1)(g)4. has been interpreted as requiring that the County prove that the individual is substantially incapable of applying his or her understanding of *the medication* and its alternatives to his or her mental illness, in order to make an informed choice about accepting or refusing treatment. *See Outagamie Cnty. v. Melanie L.*, 2013 WI 67, ¶55, 349 Wis. 2d 148, 833 N.W.2d 607.  This standard requires the petitioner to show that a committee is unable to make a connection between an expressed understanding of the benefits and risks of medication and his or her own mental illness. *Id.*, ¶71.

did not specifically discuss in its written decision which standard applied. We assume without deciding that the evidence shows Luca was capable of understanding the advantages and disadvantages of accepting medication and treatment or its alternatives. We nevertheless agree with the court's conclusion that the County presented sufficient evidence for the court to determine that Luca is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to his mental illness, in order to make an informed choice as to whether to accept or refuse medication or treatment.

¶24 Luca contends that Dr. Stress agreed that he was able to understand the advantages and understand the potential side effects of Gabapentin, was willing to take medication if it helped him, was able to recognize past treatment that had helped him, and was voluntarily taking Gabapentin when he felt he needed it. Luca argues that the circuit court may not agree with his decision to only take Gabapentin as needed or his determination that "pot" was an effective treatment. He cites, however, to the proposition that "the court's determination should not turn on the person's choice to refuse to take medication; it should turn on the person's ability to process and apply the information to the person's own condition before making that choice." *See Outagamie Cnty. v. Melanie L.*, 2013 WI 67, ¶78, 349 Wis. 2d 148, 833 N.W.2d 607. He argues that the circuit court erred in concluding that he was unable to do so.

¶25 We disagree. The circuit court concluded that Luca was unable to describe the effect Gabapentin had on him, and that "[i]t is clear that [Luca's] belief that he should die prevents him from a legitimate thought-process regarding the risk and benefits of taking Gabapentin." Dr. Stress's testimony supports this finding. He opined that Luca's claimed willingness to die and his failure to take his medication as prescribed evidenced Luca's thought processes being "impaired

due to his mental health symptoms, suicidal ideations, and planning to kill himself." Despite Luca's arguments to the contrary, this was not a case where he was competent to make an informed choice about committing suicide in lieu of undergoing treatment and taking his medication as prescribed.

¶26    Although Luca may be able to understand his medication and treatment options, it is evident from Dr. Stress's testimony that Luca's adjustment disorder with depression, chronic anxiety and major depressive disorder prevent him from processing that information and applying it in order to make an informed choice about accepting or refusing those medication and treatment options. In short, despite the fact that Luca understands the treatment and medication prescribed and their purposes, his mental illness interferes with his ability to make an informed and rational choice about whether to engage in the recommended treatment and take his medication as prescribed. Accordingly, we affirm both the order extending his involuntary commitment and the order for involuntary medication and treatment.[6]

    *By the Court.*—Orders affirmed.

    This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

---

[6] Although both parties make arguments related to mootness, we need not address them because we are releasing this opinion before Luca's recommitment order expires.